**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **NORFOLK SOUTHERN RAILWAY** | ) | **CASE NO.  4:13-cv-00313** |
| **COMPANY** | ) | |
| | ) | **JUDGE JOHN R. ADAMS** |
| **Plaintiff** | ) | |
| | ) | |
| **v.** | ) | **DECLARATORY JUDGMENT** |
| | ) | |
| **ALLIED ERECTING &** | ) | |
| **DISMANTLING CO., INC.** | ) | |
| | ) | |
| **Defendant** | ) | |

**I.    Preliminary Matters**

1.    Plaintiff Norfolk Southern Railway Company ("Norfolk Southern") filed its Complaint against Defendant, Allied Erecting & Dismantling Company, Inc., ("Allied Erecting") on February 12, 2013, generally alleging breach of contract against Allied Erecting.  In the Complaint, Norfolk Southern specifically alleged that Allied Erecting breached the terms of an October 12, 1994, deed by failing to provide Norfolk Southern with an exclusive, permanent and unconditional easement reserved by Norfolk Southern's predecessor-in-interest in a deed. Norfolk Southern further alleged that Allied Erecting breached its duties and obligations as set forth in an agreement signed by Allied Erecting's president, John R. Ramun, dated October 10, 1994, by (1) failing to convey a permanent, unconditional and exclusive easement to Norfolk Southern and (2) failing to construct a new roadway for Norfolk Southern, within ten (10) years of the date of that agreement.

2.      As a result, Norfolk Southern sued Allied Erecting as set forth in its Complaint for (1) breach of contract for money damages (Count I); (2) breach of contract for specific performance (Count II); and (3) declaratory judgment (Count III).

3.      On June 29, 2015, a jury trial commenced as to Count I of the Complaint.  On July 6, 2015, the jury unanimously found for Norfolk Southern on Count I of the Complaint.  In returning a general verdict for Norfolk Southern, the jury specifically found for Norfolk Southern on three separate issues, finding by a preponderance of the evidence that (a) Allied Erecting failed to provide Norfolk Southern with a permanent, unconditional and exclusive easement from Poland Avenue to the Haselton Yard; (b) Allied Erecting failed to construct a new roadway providing access from Poland Avenue to the Haselton Yard for Norfolk Southern's exclusive use within ten (10) years of the date of the agreement that John Ramun signed on October 10, 1994; and (c) Allied Erecting failed to convey a permanent, unconditional and exclusive easement for the new roadway within ten (10) years of the date of the agreement that John Ramun signed on October 10,1994.  (*Doc. No. 173-1.*)

4.      After finding for Norfolk Southern on those issues, the jury returned a verdict assessing damages to Norfolk Southern in the amount of $223,424.30 as to Count I of Norfolk Southern's Complaint. (*Doc. No. 173-1.*)

5.      The Court now must decide whether Norfolk Southern has proven by a preponderance of the evidence its claim under Count II of the Complaint (breach of contract for specific performance).  As to Count III of the Complaint, the Court must also declare the rights of the parties as to the October 12, 1994 deed and the October 10, 1994 agreement signed by John Ramun (declaratory judgment).

II.     **Specific Findings of Fact**

    A.     *Background*

    6.     Prior to 1994, a railroad company known as Consolidated Rail Corporation ("Conrail") ceased its railroad operations on a line of railroad known as the Canfield Branch located in Youngstown, Ohio. (*Doc. 118.*)

    7.     Conrail operated a railroad yard known as the Haselton Yard that connected to the Canfield Branch. (*Doc. 118.*)

    8.     Conrail agreed to sell its interest in the Canfield Branch, including the railroad tracks on the Canfield Branch, and a portion of the Haselton Yard to Allied Erecting in 1994. (*Doc. 118.*)

    9.     To complete the transaction, Conrail and Allied Erecting executed three (3) separate documents:

        1.  An Agreement signed and executed by Allied Erecting on October 10,1994, and recorded on August 24, 1995 (the "First Agreement") (Joint Exhibit B);

        2.  A Quit Claim Deed to the Canfield Branch and a portion of Haselton Yard dated October 12, 1994, and recorded January 13, 1995. (the "Second Agreement" ) (Joint Exhibit A); and

        3.  Agreement of Sale executed on July 22, 1994 (the "Agreement of Sale") (Joint Exhibit C);

(*Doc. 118.*)

    10.     On August 24, 2007, Norfolk Southern acquired all of Conrail's rights, title and interest in the Haselton Yard. Norfolk Southern succeeded to, or took the place of, Conrail in the Agreement of Sale, the First Agreement and the Second Agreement. Therefore, although these agreements were between Allied Erecting and Conrail, they are now treated by this Court as

between Allied Erecting and Norfolk Southern.  (*Doc. 118.*)

11.    Allied Erecting is a privately held corporation in the business of erecting and dismantling industrial buildings.   The bulk of its business is heavy industrial dismantling.   Its physical headquarters are on the south side of Poland Avenue at 1999 Poland Avenue in Youngstown, Ohio.   The headquarters are just south of Norfolk Southern's Haselton Yard. Allied Erecting is a wholly-owned subsidiary of Allied Consolidated Industries ("Allied Consolidated").   One of Allied Erecting's sister companies is Allied Industrial Development, a land developer and land holding company ("Allied Industrial").   (*Doc. 167 at 304, 306, 308, 313.*)

12.    Norfolk Southern is a Class I railroad company operating a railroad in and through several states, including Ohio.   Geographically, Norfolk Southern's Haselton Yard is located in Youngstown, Ohio, about two to five miles east of downtown Youngstown and just north of a public street, Poland Avenue.   Operationally, Norfolk Southern's Haselton Yard is located at milepost 61.0 on the Youngstown line in the Pittsburgh Division of Norfolk Southern's system of railroad track.   It is a flat switching yard, consisting of fourteen tracks and a yard office where supervisors and train crews report. (*Doc. 167 at 239-243, 278-279.*)

13.    Norfolk Southern's employees, including train conductors and engineers, access the Haselton Yard from Poland Avenue.   From Poland Avenue, Norfolk Southern employees drive their personal vehicles in a northeasterly direction onto a private road, portions of which are owned by Allied Erecting and all other portions of which are owned by Allied Industrial. This private road can be seen on Joint Exhibit D, referred to at trial and herein as the "Color Coded Map." (*See* Joint Ex. D.)

Joint Exhibit D:



Joint Ex. D          4:13-CV-00313

On the Color Coded Map, the private road runs through the portions of the map coded as pink, yellow, green, across the blue, and then back to the green, ending at the Haselton Yard. This roadway is known as the "Current Roadway."  The Current Roadway can also be seen in the photographs that are Plaintiff's Exhibit 4 and Joint Exhibits G-7, G-9, G-10 and G-11.  In these photographs, the Current Roadway is the roadway to the right of the utility poles.  All witnesses who testified as to the location of the Current Roadway were consistent, and therefore agreed, as to its location.  *(Doc. 167 at 244-246, 248-251, 278-279, 290-293, 312-313, 335-34; Doc. 168 at 383-384, 387-388, 420-421.)*

14.    The Current Roadway is made up of dirt and gravel, as well as old asphalt in some places.  Its width varies between 20- to 30-feet wide for the length of the roadway.  (*Doc. 167 at 247-248, 279-280.*)

15.    Norfolk Southern has non-exclusive easement rights to use the Current Roadway to access the Haselton Yard from Poland Avenue.  (*Doc. 168 at 536-540.*) (Joint Exhibit B.)

16.    The yellow portion of the Current Roadway runs roughly parallel to the Canfield Branch.  The Canfield Branch is color coded blue on the Color Coded Map and consists of, in relevant part, approximately 5.167 acres.  (*Doc. 167 at 230-231, 244, 312-313; Doc. 168 at 384, 416.*) (Joint Exhibit  D.)

17.    Although Allied Erecting and Allied Industrial together own the Current Roadway, neither maintains it.  Allied Erecting uses heavy industrial equipment on the Current Roadway.  This equipment is operated on the pink and yellow portions of the Color Coded Map and crosses over the blue "Canfield Branch" of the map to reach property owned by Allied Industrial.  (*Doc. 167 at 230-233, 235, 259, 262-263, 285.*)

18.    Allied Erecting's use of the Current Roadway with the heavy industrial equipment damages the Current Roadway, creating potholes, craters, and uneven surfaces, which results in an unsafe roadway for Norfolk Southern employees to use to access the Haselton Yard.  In order to alleviate and address the unsafe condition of the Current Roadway, Norfolk Southern has been forced to maintain the Current Roadway even though it does not own it.  (*Doc. 167 at 230-233, 253-255, 257, 259, 271-273, 281-286.*)

19.    As a result of Allied Erecting's damaging the surface of the Current Roadway, refusal to maintain it, and disagreement with Norfolk Southern's position about Allied Erecting's duty to build the New Roadway, Norfolk Southern incurred damages in the amount of extra

maintenance costs associated with maintaining the Current Roadway. These maintenance costs were incurred during the time period of December of 2010 through June of 2013, or thirty (30) months when Allied Erecting's heavy equipment traffic on the Current Roadway was substantial. At the conclusion of the trial, the jury awarded Norfolk Southern damages in the amount of $5,424.30 to account for these extra maintenance costs that Norfolk Southern incurred as a result of what the jury found to be Allied Erecting's breach of the agreements. (*Doc. 173; Doc. 167 at 284-289.*)

      **B.**    *Agreement of Sale*

      20.    On July 22, 1994, Conrail and Allied Erecting entered into the Agreement of Sale for the Canfield Branch and a portion of the Haselton Yard (Joint Exhibit C). In the Agreement of Sale, Allied Erecting agreed to purchase the Canfield Branch and a portion of the Haselton Yard from Conrail for $41,250.00, and to convey an exclusive easement to Conrail (the "Replacement Easement") within ten (10) years of the date of the agreement. Allied Erecting also agreed to Conrail's reservation of an exclusive easement (the "Reserved Easement"[1]). The specific provision with regard to these two (2) easements is contained in section 17 on page 7 of the Agreement of Sale. The specific provision provides, in pertinent part:

> *Purchaser [Allied Erecting] shall convey to Conrail [now Norfolk Southern] a permanent, unconditional, exclusive easement for the purpose of a roadway for vehicular and pedestrian traffic to provide access from Poland Avenue to Conrail's Haselton Yard ("New Roadway"),* and Purchaser shall construct the New Roadway at Purchaser's expense. The conveyance of said easement shall be completed within 10 years of the date of this Agreement. The location and bounds of the said easement and the design of the New Roadway shall be subject to the prior approval of Conrail. The New Roadway shall be sufficient for Conrail's intended use; the sufficiency of the New Roadway, as constructed, for Conrail's intended use shall be subject to the approval of Conrail, and no action will be taken to restrict Conrail's use of the roadway that currently runs from Poland Avenue to Conrail's Haselton Yard ("Current Roadway") until Conrail has approved the New Roadway as constructed. The bounds and location of the

---

[1] At trial, counsel referred to this easement as the "deeded easement."

easement shall not unreasonably interfere with Purchaser's use of the Premises. *The deed shall contain a reservation of an unconditional, exclusive easement* for the Current Roadway or an alternative roadway for vehicular and pedestrian traffic, the location of which alternative roadway shall also be subject to Conrail's prior approval; *said reservation shall provide that said reserved easement shall terminate upon the approval by Conrail of the New Roadway, as constructed.*

(*Doc. 168 at 380-381; Doc. 167 at 319-320*.) (Joint Exhibit C.) (Emphasis added.)

21.     In the meantime, the deed conveying the Canfield Branch to Allied Erecting would contain a reservation of an unconditional and exclusive easement for Norfolk Southern's exclusive use – i.e., the Reserved Easement – so that Norfolk Southern could ensure it would have access to the Haselton Yard from Poland Avenue until the Replacement Easement was conveyed and the New Roadway built.   When those two things had occurred, the Reserved Easement would terminate.  (Joint Exhibit C.)

C.     *First Agreement – the October 10, 1994, Agreement signed by Mr. Ramun*

22.     In connection with and in furtherance of section 17 of the Agreement of Sale above, Mr. Ramun, President of Allied Erecting, signed the First Agreement.  (Joint Exhibit B). The First Agreement provides in pertinent part:

> Grantor [Allied Erecting] will convey to Grantee [Conrail, now Norfolk Southern] a permanent, unconditional and exclusive easement for the purpose of a roadway for vehicular and pedestrian traffic to provide access from Poland Avenue to Grantee's adjoining and adjacent property ("New Roadway"), and Grantor shall construct the New Roadway at Grantor's sole cost and expense. The conveyance of the said easement shall be completed within ten (10) years of the date of this Agreement as evidenced by a recordable document, or otherwise in the absences of such recordable document this Agreement shall remain in effect.  The location and bounds of the said easement and the design of the New Roadway shall be subject to the prior approval of Grantee.  The New Roadway shall be sufficient for Grantee's intended use; the sufficiency of the New Roadway as constructed for Grantee's intended use shall be subject to the approval of Grantee, and no action will be taken to restrict Grantee's use of the roadway that currently runs from Poland Avenue to Grantee's Haselton Yard ("Current Roadway") until Grantee has approved the New Roadway as constructed.  The bounds and location

of the easement shall not unreasonably interfere with the Grantor's use of the Premises.

(*Doc. 168 at 385-386; Doc. 167 at 325-326*) (Joint Exhibit B.)

23.    With this language, Allied Erecting agreed to convey a permanent, unconditional and exclusive easement to Norfolk Southern for the purpose of the New Roadway and to construct the New Roadway, within ten (10) years of the date of the First Agreement – October 10, 1994.   Allied Erecting agreed to solely bear the cost of the design and construction of the New Roadway, and to solely bear the cost of the relocation of any of Norfolk Southern's utilities, if necessary.   Allied Erecting also agreed to take no action to restrict Norfolk Southern's use of the Current Roadway until Norfolk Southern approved the New Roadway as constructed.  (Joint Exhibit  B.)

24.    With regard to the First Agreement, although Allied Erecting claims that the terms of that agreement create an option for Allied Erecting to build the New Roadway within ten (10) years of the date of that agreement, the word "option" never appears nor is referenced in that agreement. Only terms such as "will" and "shall" are used in connection with Allied Erecting's agreement to convey a permanent, unconditional and exclusive easement and to construct the New Roadway for Norfolk Southern within ten (10) years of the date of the First Agreement.   These terms clearly and unambiguously create an obligation, rather than an option, to convey the Replacement Easement and to construct the New Roadway within ten (10) years of the date of the First Agreement.  (Joint Exhibit  B.)

25.    Allied Erecting has not conveyed the Replacement Easement to Norfolk Southern, nor built the New Roadway as of the date of trial.  (*Doc. 167 at 333-334; Doc. 168 at 428*).

### D.  *Second Agreement – the Quitclaim Deed*

26.     On October 12, 1994, Conrail signed a quit claim deed, referred to herein as the Second Agreement, conveying the Canfield Branch to Allied Erecting.  (Joint Exhibit A.)  Allied Erecting paid $41,250.00 for the Canfield Branch.   Conrail performed its obligations in connection with the property sale by conveying the Canfield Branch to Allied Erecting (*Doc. 167 at 314, 318-319, 345; Doc. 168 at 395.*) (Joint Exhibit A.)

27.     Within the Second Agreement, certain easements were reserved by Conrail, including a permanent, unconditional and exclusive easement as set forth on page 2:

> EXCEPTING AND RESERVING thereout and therefrom and unto the said Grantor [Conrail, now Norfolk Southern], a permanent, unconditional and exclusive easement on, over, across and through the Premises [the Canfield Branch] for vehicular and pedestrian roadway access purposes so that Grantor may have continuous ingress, egress and regress rights from Poland Avenue to Grantor's Haselton Yard property; the rights shall expire upon Grantee [Allied Erecting] providing Grantor a new constructed roadway across property of the Grantee and when said roadway is constructed Grantor shall release such right.

(*Doc. 167 at 344-345; Doc. 168 at 388-389.*) (Joint Exhibit A.)

28.     As set forth in the Agreement of Sale and agreed to by Allied Erecting, a permanent, unconditional and exclusive easement was reserved over the conveyed Canfield Branch in the Second Agreement (being the same easement as that referred to above as the Reserved Easement) to ensure Conrail (now Norfolk Southern) had access from Poland Avenue to the Haselton Yard, with such easement rights only expiring upon Allied Erecting's conveyance of the Replacement Easement and construction of the New Roadway.  (*Doc. 167 at 346; Doc. 168 at 390, 421.*)  (Joint Exhibit A.)

29.     This Reserved Easement was to be for Norfolk Southern's exclusive use, meaning that it was supposed to be for Norfolk Southern's use only, excluding all others, including Allied Erecting.  (*Doc. 167 at 390.*)  (Joint Exhibit A.)

10

30.     Contrary to the "exclusive" nature of the Reserved Easement, as provided by the terms of the Second Agreement (noted above), Allied Erecting crosses the Reserved Easement. At the northern end of the yellow portion of the Color Coded Map, Allied Erecting drives its heavy industrial equipment across part of the blue "Canfield Branch" portion to get to Allied Industrial's property.   As confirmed by the jury verdict, Allied Erecting is not treating the Reserved Easement as an exclusive easement to Norfolk Southern.  (*Doc. 167 at 253-254, 233; Doc. 168 at 425.*)

31.     Allied Erecting has not honored the terms of the Second Agreement because it operates its equipment across the Reserved Easement. (Joint Exhibit A.)

E.     ***Norfolk Southern's Conceptual Design for a New Roadway***

32.     Norfolk Southern provided testimony from John Tomlin.   Mr. Tomlin is the System Engineer – Design at Norfolk Southern.   Mr. Tomlin leads a team of Norfolk Southern engineers in track design projects.   He has experience designing and estimating the cost of the construction of gravel access roads to railroad yards, including such access roads in Ohio.   He is a professional licensed engineer with fifteen (15) years experience in the engineering department at Norfolk Southern.   He is qualified to testify to matters involving engineering design and cost estimation of railroad construction, including access roads leading to railroad facilities.   The Court recognizes Mr. Tomlin as an expert in this field.  (*Doc. 168 at 434-438.*)

33.     Mr. Tomlin provided an estimate for the design and construction of a new roadway to be built on Allied Erecting's property in accordance with the First Agreement.   Given Allied Erecting's property interests at or near the Haselton Yard and Poland Avenue, the new roadway is primarily located on the Canfield Branch.  (*Doc. 168 at 434-438.*)

34.  To a reasonable degree of engineering certainty, Mr. Tomlin's estimate for the design and construction of a new roadway on Allied Erecting property totals $218,000.00 as of the time of trial.  The summary of the costs that form the estimate for the proposed New Roadway can be seen in Plaintiff's Exhibit 47 and the detail of the costs that form the estimate can be seen in Plaintiff's Exhibit 48.  (*Doc. 168 at 446, 451, 455.*)  (Plaintiff's Exhibits 37, 38, 47, 48.)

35.  During trial, Allied Erecting neither proposed nor submitted for the jury's or Court's consideration any alternative design of a new roadway that connects Poland Avenue with Haselton Yard.  The only proposal of a design of a new roadway came from Norfolk Southern.

# CONCLUSIONS OF LAW

1.  State law provides the substantive basis for deciding Norfolk Southern's claims. When a federal court's jurisdiction is premised upon diversity of citizenship, that federal court is obligated to follow the substantive law of the forum state.  *See Hanna v. Plumber*, 380 U.S. 460, 465 (1965); *Lones v. Detroit, Toledo & Ironton R.R. Co.*, 398 F.2d 914, 918 (6th Cir. 1968). Because the Court's jurisdiction over Norfolk Southern's claims against Allied Erecting is premised upon diversity of citizenship, the Court must apply Ohio law.

2.  Under Ohio law, "a breach of contract occurs when [1] a party demonstrates the existence of a binding contract or agreement; [2] the non-breaching party performed its contractual obligations; [3] the other party failed to fulfill its contractual obligations without legal excuse; and [4] the non-breaching party suffered damages as a result of the breach." *Garofalo v. Chicago Title Ins. Co.*, 104 Ohio App. 3d 95, 108,  661 N.E.2d 218 (Ohio Ct. App. 1995) (citing *Nat'l City Bank v. Erksine & Sons*, 158 Ohio St. 450, 110 N.E.2d 598 (Ohio 1953).

3.      When ruling on the motions for summary judgment, this Court previously found the language of the First and Second Agreements to be ambiguous and that extrinsic evidence did not resolve the ambiguity.  As such, the Court found that a trial, including parol evidence, was necessary to resolve the parties' factual disputes.

4.      As Ohio courts have held, "parol evidence is admissible only if the terms of the contract are ambiguous and, then, only *to interpret but not to contradict* the express contractual language."  *Yoder v. Thorpe*, 2007-Ohio-5866, ¶ 42 (Ohio Ct. App. 2007) (emphasis added). Federal courts applying Ohio law have repeatedly held the same.  *See Lincoln Elec. Co. v. St. Paul Fire & Marine Ins. Co.*, 210 F.3d 672, 683 (6th Cir. 2000).

5.      Applying this law to the facts elicited at trial, this Court first finds that with regard to the Agreement of Sale, the First Agreement, and the Second Agreement, Norfolk Southern succeeded Conrail as to all of Conrail's rights and interest in the aforementioned agreements.

6.      This Court further finds that the Agreement of Sale, the First Agreement, and the Second Agreement are enforceable contracts between Norfolk Southern and Allied Erecting.

7.      This Court further finds that Norfolk Southern complied with the terms of the agreements because the Canfield Branch was conveyed to Allied Erecting in 1994.

8.      The Court further finds that the location of the Current Roadway as that term is used in the agreements and the location of the Reserved Easement are not in dispute.

9.      Allied Erecting has not conveyed a permanent, unconditional and exclusive easement to Norfolk Southern, nor built a New Roadway to replace the non-exclusive Current Roadway within ten years of the date of the First Agreement, or October 10, 2004.  Further, Allied Erecting's refusal to maintain the Current Roadway despite the damage that its equipment

has done and will continue to do to the Current Roadway effectively restricts Norfolk Southern's use of the Current Roadway.

10.     Allied Erecting has offered no legal excuse for its failure to comply with its obligations under the First Agreement.  Therefore, consistent with the jury's answers to jury interrogatory 1(B) and (C) and its unanimous general verdict in favor of Norfolk Southern (Doc. No. 173), this Court finds, by a preponderance of the evidence, that Allied Erecting has breached the terms of the First Agreement, and Norfolk Southern is entitled to specific performance under Count II of the Complaint.

11.     An easement does exist on the Canfield Branch for Norfolk Southern to use and is referred to as the "Reserved Easement" in the findings of fact above.  However, although Allied Erecting approved the terms of the Second Agreement before Conrail executed and signed the deed, Allied Erecting is not treating this easement as exclusive to Norfolk Southern as required by the reservation language in the Second Agreement, and Norfolk Southern is entitled to specific performance under Count II of the Complaint..

12.     Allied Erecting has offered no legal excuse for its failure to comply with its obligations under the Second Agreement.  Therefore, consistent with the jury's answers to jury interrogatory 1(A) and its unanimous general verdict in favor of Norfolk Southern, this Court finds, by a preponderance of the evidence, that Allied Erecting has breached the terms of the Second Agreement.

13.     In addition to seeking monetary damages and specific performance for Allied Erecting's breach of contract, Norfolk Southern has also requested that the Court issue a declaratory judgment establishing the respective rights of the parties under the agreements at

issue. The United States Sixth Circuit Court of Appeals has set forth the following factors in considering whether to issue a declaratory judgment:

> (1) whether the declaratory action would settle the controversy; (2) whether the declaratory action would serve a useful purpose in clarifying the legal relations in issue; (3) whether the declaratory remedy is being used merely for the purpose of "procedural fencing" or "to provide an arena for a race or *res judicata*"; (4) whether the declaratory action would increase friction between our federal and state courts and improperly encroach upon state jurisdiction; and (5) whether there is an alternative remedy which is better or more effective.

*Grand Trunk Western R.R. Co. v. Consol. Rail Corp.*, 746 F. 2d 323, 326 (6th Cir. 1984).

14.     Implicit in these findings is the declaration of the rights and obligations of the parties. Conrail was to convey all of its rights and interest in the Canfield Branch to Allied Erecting. The Canfield Branch was conveyed to Allied Erecting, so Norfolk Southern, as Conrail's successor to the aforementioned agreements, has fulfilled its obligations as to the First Agreement and the Second Agreement. Allied Erecting was to pay $41,250 for the Canfield Branch. There is no dispute that Allied Erecting paid $41,250 for the Canfield Branch. However, in further consideration for the conveyance of Conrail's rights and interest in the Canfield Branch, Allied Erecting was also obligated to: (1) provide Norfolk Southern with a permanent, unconditional and exclusive easement between Poland Avenue and Haselton Yard until the New Roadway was constructed pursuant the Second Agreement; (2) convey a permanent, unconditional and exclusive easement to Norfolk Southern for purposes of the New Roadway from Poland Avenue to Haselton Yard to replace the Current Roadway and to construct the New Roadway within ten (10) years of the date of the First Agreement, or by October 10, 2004; (3) solely bear the cost of the design and construction of the New Roadway and the relocation, if necessary, of any utilities; (4) locate and bound the said easement and design and construct the New Roadway, subject to Norfolk Southern's prior approval; and (5)

15

take no action to restrict Norfolk Southern's use of the Current Roadway until Norfolk Southern has approved the New Roadway as constructed.

15.     The Court finds that the declaration of rights herein will settle the controversy between Norfolk Southern and Allied Erecting and clarify the legal relations in issue.  Indeed, the Court's findings here, as well as the jury's verdict, will provide *res judicata* for any issues that arise between the parties with regard to the issues decided herein.  Further, there is no danger of any friction created between federal and state courts by deciding and declaring the rights of the parties herein.

**THEREFORE, it is adjudged, decreed and ordered that:**

1.     Because the jury verdict included an award to Norfolk Southern for the cost of building a Replacement Roadway, Allied Erecting's obligation to build a new roadway is extinguished – although Allied Erecting's obligation to convey an exclusive easement on which to allow Norfolk Southern to build a Replacement Roadway remains.  As such, within sixty (60) days of the date of this Order, Allied Erecting shall convey to Norfolk Southern a permanent, unconditional and exclusive easement for the purpose of a new roadway for vehicular and pedestrian traffic to provide Norfolk Southern access from Poland Avenue to the Haselton Yard,

2.     The location and bounds of the easement to be conveyed shall be sufficient for the construction of a new roadway;

3.     Allied Erecting shall work with Norfolk Southern's Real Estate Engineering and Law Departments in conducting the survey and preparing the deed of easement necessary for the conveyance of the easement referred to in paragraphs 1 and 2 of this Order;

4.     Within thirty (30) days of the date of the Judgment on the Verdict, Allied Erecting shall satisfy the amount of the jury award in the amounts of 1)  $218,000.00 - the estimated cost

of the design and construction of the Replacement Roadway if Norfolk Southern were to design and construct the Replacement Roadway – and 2) $5,424.30, plus any pre-judgment interest, if any. As such, Allied Erecting shall pay Norfolk Southern a total of $223,424.30 in accordance with the jury's award;

5.     Allied Erecting shall, from the date of this Order until the Replacement Roadway is built, sufficiently maintain the Current Roadway, ensuring that the road's surface is level and free from potholes and cleared from more than two (2) inches of snow accumulation. Further, Allied Erecting will take no action to restrict Norfolk Southern's use of the Current Roadway until Norfolk Southern has approved the Replacement Roadway as constructed;

6.     Allied Erecting shall, as of the date of this Order, immediately cease using the Reserved Easement as described in the above findings of fact, including its practice of crossing the Reserved Easement;

7.     This Court shall retain jurisdiction to enforce the Orders set forth herein. Failure by Allied Erecting to abide by the Orders set forth herein may result in sanctions, including Norfolk Southern's incurred expenses and reasonable attorneys' fees, against Allied Erecting.


        IT IS SO ORDERED:


*January 4, 2016*                          */s/ John R. Adams*
Date                                       Judge John R. Adams

17